# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2012

No. 10-60614

Lyle W. Cayce
Clerk

STATE OF TEXAS; TEXAS OIL & GAS ASSOCIATION; TEXAS
ASSOCIATION OF MANUFACTURERS; BCCA APPEAL GROUP;
AMERICAN CHEMISTRY COUNCIL; AMERICAN PETROLEUM
INSTITUTE; NATIONAL ASSOCIATION OF MANUFACTURERS;
NATIONAL PETROCHEMICAL AND REFINERS ASSOCIATION; TEXAS
ASSOCIATION OF BUSINESS; TEXAS CHEMICAL COUNCIL; CHAMBER
OF COMMERCE OF THE UNITED STATES OF AMERICA

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respondent

Petitions for Review of an Order of the
Environmental Protection Agency

Before JOLLY, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Sixteen years tardy, the Environmental Protection Agency (EPA) disapproved a revision to Texas's plan for implementing the requirements of the Clean Air Act. The untimely disapproval unraveled approximately 140 permits issued by Texas under the revision's terms, and now requires regulated entities to qualify for pre-revision permits or risk federal sanctions. Petitioners—the State of Texas; the Chamber of Commerce of the United States; and

No. 10-60614

representatives of nationwide manufacturing, chemical and petroleum industries—petition for review of the EPA's action under the Administrative Procedure Act. *See* 5 U.S.C. § 706.

We hold that the EPA's disapproval of Texas's plan fails Administrative Procedure Act review. Although the EPA acknowledges the distinct role of the states, which is congressionally called for in the design and enforcement of State Implementation Plans, the EPA based its disapproval on demands for language and program features of the EPA's choosing, without basis in the Clean Air Act or its implementing regulations. For the foregoing reasons, we GRANT the petition for review, VACATE the EPA's disapproval of Texas's plan, and REMAND.

I.

A.

In 1963, Congress passed the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q, which was the first federal attempt at pollution control. Amendments to the CAA in 1970 significantly expanded its scope and complexity. The 1970 Amendments introduced National Ambient Air Quality Standards (NAAQS), which require concentrations of common air pollutants at levels safe to human health. Proximate to the 1970 Amendments, Congress created the Environmental Protection Agency, which was charged with setting NAAQS and other regulatory standards in order to ensure increased public health and overall air quality. Congress amended the CAA again in 1977, creating New Source Review, a preconstruction permitting program for all new, stationary pollution sources. Another round of amendments in 1990 brought significant changes to the CAA, but those changes, "at least as they concern EPA's approval of State Plans were predominately of syntax, not substance." *Virginia v. EPA*, 108 F.3d 1397, 1409 (D.C. Cir. 1997).

No. 10-60614

1.

As designed by Congress, states play a central role in the CAA regulatory structure. Every state must formulate and administer a State Implementation Plan (SIP), which outlines the state's pollution control strategy for achieving NAAQS. 42 U.S.C. § 7410(a)(1). SIPs must "include enforceable emission limitations and other control measures, means, or techniques . . . as well as schedules and timetables for compliance, as may be necessary or appropriate to meet" the applicable NAAQS. *Id.* § 7410(a)(2)(A). SIPs must also provide for the establishment and operation of "appropriate devices, methods, systems, and procedures necessary to monitor, compile, and analyze data on ambient air quality," and include an enforcement program. *Id.* § 7410(a)(2)(B)-(C).

Every state must include in its SIP a New Source Review (NSR) scheme for pre-construction permits. 40 C.F.R. § 51.160. All new or modified pollution sources must receive a pre-construction permit under an approved SIP. If a source does not receive a permit, then it violates the CAA, regardless of the amount of pollution the source emits.

An important background fact to keep in mind as we decide this petition is that the CAA's NSR requirements distinguish between major and minor pollution sources. Major sources are facilities that emit more than a pre-identified amount, usually 100 tons per year, of a regulated contaminant.[1] Because major sources have the potential to make a greater impact on NAAQS, Congress and the EPA have focused the vast majority of their regulatory efforts on Major NSR.

---

[1] Defining what constitutes a major source often depends on the area in which the source is located. *See* 42 U.S.C. §§ 7479(1), 7602(j); *see also* 40 C.F.R. §§ 51.166(b)(49)(iv), 51.165(a)(1)(iv). A source is major in any area if it emits more than 10 tons per year of any Hazardous Air Pollutant or 25 tons per year of all Hazardous Air Pollutants combined. 42 U.S.C. § 7412(a)(1). What constitutes a major modification is further defined in 40 C.F.R. § 51.166(b)(2).

No. 10-60614

The type of Major NSR program in place in a given geographic area depends on how well the air quality conforms to NAAQS. In areas that have already achieved NAAQS, a state must implement a Prevention of Significant Deterioration (PSD) program. Because the air in the area is already safe for the public, the main purpose of this program is to ensure that the air quality is not affected by the new source. In areas that have not yet achieved NAAQS, the state must implement a stricter Major NSR program: the Non-Attainment NSR (NA NSR). Whereas PSD programs seek to prevent interference with the existing air quality, NA NSR programs are designed to improve air quality to achieve NAAQS.

Minor sources are facilities that emit less than a pre-identified amount, usually 100 tons per year, of a regulated contaminant after construction or modification. All SIPs must contain a Minor NSR program, regardless of whether the area has achieved NAAQS. Understandably, Congress and the EPA have devoted much less attention to Minor NSR. The EPA's regulations of Minor NSR span only two pages of the Code of Federal Regulations.

2.

Beyond these basic requirements, states enjoy a measure of discretion. "So long as the national standards are met, the State may select whatever mix of control devices it desires." *Union Elec. Co. v. EPA*, 427 U.S. 246, 266 (1976) (citing *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)).

The EPA is charged with assuring that a state SIP complies with federal law. 42 U.S.C. § 7410(k). That power, however, is limited:

> [T]he Clean Air Act creates a partnership between the states and the federal government. The state proposes, though the EPA disposes. The federal government through the EPA determines the ends–the standards of air quality–but Congress has given the states the initiative and a broad responsibility regarding the means to achieve those ends through state implementation plans and timetables for

No. 10-60614

> compliance. . . . The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over the procedural prerogatives that the Act has reserved to the states . . . .

*Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984) (internal citation omitted).

The Clean Air Act and the EPA supply "the goals and basic requirements of state implementation plans, but the states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003) (citing *Union Elec. Co.*, 427 U.S. at 266). The prevention and control of air pollution are "the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3); *see also American Cyanamid Co. v. EPA*, 810 F.2d 493, 500-01 (5th Cir. 1987). Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA must approve it. 42 U.S.C. § 7410(k)(3); *BCCA Appeal Grp.*, 355 F.3d at 822.

States regularly revise and reevaluate pollution control strategies, and revisions to a SIP must satisfy the CAA section 110(*l*) requirements. Under that section, the EPA cannot approve a SIP revision "if the revision would interfere with any applicable requirement concerning attainment" of NAAQS "or any other applicable requirement" of the CAA. 42 U.S.C. § 7410(*l*). Moreover, the CAA requires that the EPA review and either approve or disapprove of any SIP or SIP revision within eighteen months of its submission. *Id.* § 7410(k).

### B.

In November 1994, Texas Governor Ann Richards submitted a Flexible Permit Program to the EPA as a revision to Texas's SIP and as a new feature of the state's Minor NSR regime. Under this Program, a facility could obtain a permit that would set an ex ante emissions cap, that is, modifications to facilities could be made without additional regulatory review as long as the emissions

No. 10-60614

increase would not exceed an aggregate limit specified in the permit. The Texas Commission on Environmental Quality (TCEQ) had adopted the Program earlier that year.[2]  Later, the Texas Legislature incorporated the Program into the Texas Clean Air Act. *See* Tex. Health & Safety Code § 382.003(9)(F).  In her 1994 submission letter, the Governor expressed hope for an "expeditious approval of these revisions to the Texas SIP."

Despite the CAA's mandate that the EPA approve or disapprove a SIP revision within eighteen months of its submission, the EPA delayed formal consideration of the Texas Flexible Permit Program for more than a decade.  In response to the Agency's inaction, some of the industry petitioners asserted their rights under 42 U.S.C. § 7604(a)(2) and brought a  mandatory duty suit compelling the EPA to "approve or disapprove, in whole or in part" the Program. The suit resulted in a settlement, with the EPA agreeing to make a final decision on the Program within a specified timeline.

The EPA proposed disapproving the Program in 2009 and issued final disapproval of the Program on July 15, 2010.  Proposed Rule; Flexible Permits, 74 Fed. Reg. 48,480 (proposed Sept. 23, 2009) (to be codified at 40 C.F.R. pt. 52); Final Rule; Flexible Permits, 75 Fed. Reg. 41,312 (July 15, 2010) (to be codified at 40 C.F.R. pt. 52).  As a result of the EPA's disapproval every facility with a flexible permit could face fines or other enforcement action irrespective of emissions levels.  The petitioners now challenge the EPA's ruling and seek to set it aside.

---

[2] This agency was known at the time as the Texas Natural Resource Conservation Commission.

No. 10-60614

## II.

Under the Administrative Procedure Act, we must set aside the EPA's ruling "if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Sun Towers, Inc. v. Schweiker*, 694 F.2d 1036, 1038 (5th Cir. 1983); 5 U.S.C. § 706(2). We must also set aside the EPA's ruling if it is in excess of the EPA's statutory authority. 5 U.S.C. § 706(2)(C). In applying this standard, we look to whether the EPA examined the relevant data and articulated a "satisfactory explanation for its action including a rational connection between the facts found and the choice made. . . . In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

Our review is most deferential to the EPA's fact findings, particularly where those findings relate to the EPA's evaluation of scientific data for which the Agency possesses technical expertise. *BCCA Appeal Grp.*, 355 F.3d at 824. Throughout our review, we also defer to the EPA's interpretation of the CAA for questions on which the statute is silent or ambiguous, asking only whether the EPA has rendered a "permissible construction." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

The CAA's regulatory design, which requires cooperation between the federal government and the states in administering the CAA, also necessarily informs our review.

## III.

With these principles in mind, we now move to the specific reasons the EPA gave for disapproving Texas's Flexible Permit Program: (1) the Program might allow major sources to evade Major NSR; (2) the provisions for monitoring,

No. 10-60614

recordkeeping and reporting are inadequate; (3) and the methodology for calculating  flexible permit emissions caps lacks clarity and is not replicable.

A.

1.

We begin with the EPA's primary ground for disapproving the Flexible Permit Program: The Program might allow major sources to evade Major NSR. The EPA found that the Flexible Permit Program "has no express regulatory prohibition clearly limiting its use to Minor NSR and has no regulatory provision clearly prohibiting the use of this submitted Program from circumventing the Major NSR SIP requirements." 75 Fed. Reg. at 41,313.   The EPA's concern is that the Flexible Permit Program, which Texas has represented as a form of Minor NSR, might make it possible for major sources to evade Major NSR. *Id.* This danger exists, the EPA argues, because of the absence of an express statement that the Program does not apply to major source construction or modification.

Although the EPA's concern over the potential for Major NSR evasion involves the Agency's interpretation of a law, it does not involve the interpretation of a federal law.  Before approval by the EPA, a SIP revision is state law for which the EPA's interpretation is not authoritative. *Luminant Generation Co., LLC v. EPA*, 2012 WL 3065315, at *14 (5th Cir. July 30, 2012) (citing *American Cyanamid*, 810 F.2d at 493).  We need not, therefore, accept that Major NSR evasion is probable based solely on deference to the EPA's interpretation of the Texas law that forms the basis of this petition.

Furthermore, the EPA did not make findings demonstrating that the Flexible Permit Program "would interfere with any applicable requirement concerning attainment" of NAAQS "or any other applicable requirement" of the CAA.  42 U.S.C. § 7410(*l*).  Although we do not here decide whether the EPA must make findings before concluding that a SIP revision would interfere with

the requirements of the CAA, the lack of findings moots any suggestion that we must defer to the EPA's technical expertise. The EPA did not rely on its technical expertise in rejecting the Flexible Permit Program, and we cannot either. Thus, our interpretation of the Texas law that forms the basis of this petition is not influenced by deference to either the EPA's interpretive or fact-finding ability. We do not decide whether the EPA must make fact findings demonstrating interference with the CAA because it is unnecessary in this case: The EPA has failed not only to put forth evidence demonstrating interference, but also to put forth a cogent theory on how Texas's manner of drafting would result in interference. The standard for disapproving a SIP revision—that the revision would interfere with the CAA—surely requires more than the EPA's bare conclusion. *Id.*

The Flexible Permit Program does not allow Major NSR evasion because it affirmatively requires compliance with Major NSR. The operative language, found in 30 Tex. Admin. Code § 116.711(8)-(9) (2010), states with respect to Major NSR:[3]

> (8)     Nonattainment review.
> If the proposed facility, group of facilities, or account is located in a nonattainment area, each facility shall comply with all applicable requirements concerning nonattainment review in this chapter.
> (9)     Prevention of Significant Deterioration (PSD) review.
> If the proposed facility, group of facilities, or account is located in an attainment area, each facility shall comply with all applicable requirements in this chapter concerning PSD review.

Another provision in this chapter states that "[i]f more than one state or federal rule or regulation or flexible permit condition are applicable, then the most

---

[3] Sections 116.711(8) and (9) have been re-codified as 116.711(2)(H) and (I), respectively.

stringent limit or condition shall govern and be the standard by which compliance shall be demonstrated." *Id*. § 116.715(c)(10) (2010).[4]

In the EPA's own parlance, the term "Major NSR" refers to Non-attainment NSR (NA NSR) and to Prevention of Significant Deterioration (PSD). Flexible Air Permitting Rule, 74 Fed. Reg. 51,418, 51,421 (Oct. 6, 2009) (to be codified at 40 C.F.R. pts. 70-71) ("We often refer to the PSD and NA NSR programs together as the major NSR program because these programs regulate only major sources."). Because the Texas permitting scheme affirmatively requires compliance with "Non-attainment review" and "PSD"—the components of Major NSR— it does not, on its face, allow major sources to evade Major NSR.[5]

The EPA is not satisfied with the language Texas has chosen, and would prefer an express negative statement that the Flexible Permit may not be used to evade Major NSR. But it cannot direct us to any provision of the CAA or the CAA's implementing regulations that empower it to disapprove a SIP revision on this basis. The EPA argues that negative statements prohibiting major sources from avoiding Major NSR are required by Agency policy. *See* Proposed Policy; State Implementation Plans, 52 Fed. Reg. 45,044, 45,106 (proposed Nov. 24, 1987). The EPA did not, however, cite this policy in its final rule disapproving the Program. We review the EPA's disapproval for the grounds on which that disapproval was based, not on post hoc rationalizations. *See NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998). Assuming

---

[4] This section also states that "[a]cceptance of a flexible permit by a permit applicant constitutes an acknowledgment and agreement that the holder will comply with all Rules, Regulations, and Orders of the commission issued in conformity with the [Texas Clean Air Act] and the conditions precedent to the granting of the permit." 30 Tex. Admin. Code § 116.715(c)(10) (2010).

[5] Lest there be any doubt that Texas's SIP proposal uses the terms PSD and non-attainment in the same way as the EPA, the regulation specifies that "terms used by [TCEQ] have the meanings commonly ascribed to them in the field of air pollution control." *Id*. § 116.10 (2010).

No. 10-60614

that a policy exists that favors negatively worded regulations over affirmatively worded regulations, we will not consider it for the first time on appeal.

In any event, there is reason to doubt the existence of a policy that favors negatively worded regulations.  As the EPA conceded in its final rule on the Flexible Permit Program, language "explicitly prohibit[ing] circumvention of the Major NSR requirements . . . is not ordinarily a minimum NSR SIP program element."   75 Fed. Reg. at 41,318-19.   Before this case arose, the EPA's considered view, expressed after notice and comment rulemaking, was that because of the generality of its Minor NSR regulation, "SIP-approved minor NSR programs can vary quite widely from State to State."  74 Fed. Reg. at 51,421.  This view makes sense given that the EPA's regulations of Minor NSR consist of generalities that span a mere two pages of the Code of Federal Regulations.

The EPA points to other Texas Minor NSR programs that include express negative statements forbidding circumvention of Major NSR as examples of what the Agency wants. *See* 30 Tex. Admin. Code §§ 106.4(a)(3), 116.610(b).  Although we acknowledge that Texas's drafting style is not uniform within its Minor NSR regime, we do not agree that this lack of uniformity is a lawful basis for the EPA to reject the Flexible Permit Program.  Neither the CAA nor its implementing regulations make uniformity in state drafting a requirement for SIPs.

Because the administrative record reflects that the EPA's rejection is based, in essence, on the Agency's preference for a different drafting style, instead of the standards Congress provided in the CAA, the EPA's decision disturbs the cooperative federalism that the CAA envisions.  A state's "broad responsibility regarding the means" to achieve better air quality would be hollow indeed if the state were not even responsible for its own sentence structure. *Bethlehem Steel Corp.*, 742 F.2d at 1036.

> EPA has thus entangled itself in a matter beyond its proper concern and has done so in the face of well-founded state

No. 10-60614

objections. This is clearly an abuse of discretion; it is agency action beyond the Congressional mandate. It serves, furthermore, to usurp state initiative in the environmental realm, and thus to disrupt the balance of state and federal responsibilities that undergird the efficacy of the Clean Air Act.

*Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 589 (5th Cir. 1981) (internal citations omitted).

We therefore hold that the EPA's first proffered reason for rejecting the Texas Program is arbitrary and capricious, and in excess of its statutory authority. 5 U.S.C. § 706(2). The CAA furnishes the standards that the EPA is to apply in disapproving SIP revisions, and those standards do not require drafting in negative terms. The Texas Administrative Code affirmatively requires compliance with Major NSR, and does not, therefore, allow Major NSR evasion.[6]

---

[6] The EPA suggests that this Court should accommodate its position because amending the program to "avoid any potential confusion or misuse" would be relatively simple and easy for Texas to achieve. This argument overlooks the practical effect of the Agency's disapproval. As noted at the outset, the EPA considers the Flexible Permit Program now to be unsatisfactory and the numerous entities who have been relying on flexible permits for the past sixteen years are now vulnerable to enforcement action. In those actions the EPA would not have to prove that permit holders have actually violated Major NSR, or polluted improperly—a company could be fined simply because the Texas Flexible Permit Program does not have the EPA's preferred regulatory phrasing.

Although we do not rest our decision here, we note that the EPA might have made use of its conditional approval authority. *See, e.g., Natural Res. Def. Council v. EPA*, 22 F.3d 1125, 1134 (D.C. Cir. 1994) (citing H.R.Rep. No. 490, 101st Cong., 2d Sess., pt. 1 at 220 (1990)) ("[CAA section]110(k)(4) authorizes conditional approval of a SIP where the State commits to adopt such specific enforceable additional measures as EPA requires within one additional year . . . .")). The EPA had been conferring with the TCEQ for several years and was well aware that although Texas considered its program approvable as submitted it would have amended the text if necessary. In fact, before the EPA's final disapproval, TCEQ proposed clarifying amendments. The EPA stated at oral argument that it did not need to consider the possibility of conditional approval because Texas did not explicitly ask for it in its submission. True or not, the EPA's insistence on this punctilio of language surely is not what Congress intended by cooperative federalism, particularly after what the EPA concedes was delay far in excess of the statutory deadline.

No. 10-60614

2.

The EPA further challenges Texas's choice of language, arguing that an "overly broad" definition of the term "account" in the Flexible Permit Program also creates the possibility for major sources to evade Major NSR requirements. *See* 75 Fed. Reg. at 41,327-28. The EPA's concern is that the definition of "account" refers simply to "sources," creating the possibility that multiple major sources might form an "account," obtain a flexible permit, and circumvent Major NSR.

In direct response, Texas notes that because the term "account" appears nowhere in Texas's Major NSR rules and because that program instead uses the term "major stationary source," a permit holder who tried to avoid Major NSR by relying on the account definition in this hypothetical fashion would explicitly violate Texas Major NSR rules embodied in the existing SIP.

Again, the Flexible Permit Program affirmatively requires compliance with Major NSR. The terms of the Flexible Permit Program require the TCEQ to examine a flexible permit application to see if the applicant, even an applicant that is an "account," is required to comply with Major NSR. 30 Tex. Admin. Code § 116.711 (2010). Polluters must comply with Major NSR, whenever applicable. *Id.*

Notably, the EPA never raised concern over the meaning of "account" in its prior approvals of Texas's Major NSR rules. *See generally*, Approval and Promulgation of Air Quality Implementation Plans,75 Fed. Reg. 55,978 (Sept. 15, 2010) (to be codified at 40 C.F.R. pt. 52); Revisions to Permits by Rule and Regulations for Control of Air Pollution by Permits for New Construction or Modification, 74 Fed. Reg. 11,851 (Mar. 20, 2009). The Agency even approved this same definition of account in 2005 "under section 110 of the Federal Clean Air Act." *See* Limited Approval and Promulgation of Implementation Plans,70 Fed. Reg. 16,129 (Mar. 30, 2005) (to be codified at 40 C.F.R. pt. 52).

No. 10-60614

To the extent that the EPA speculates that a permit holder might wilfully disregard Major NSR, TCEQ has clear authority to prevent and deter that type of misconduct. *See* 30 Tex. Admin. Code §§ 70.1-70.11.

B.

We now turn to the second ground the EPA gave for rejecting the Flexible Permit Program: The regulations contain inadequate monitoring, record keeping and recording (MRR) provisions. The EPA disapproved the MRR provisions as conferring too much discretion on the TCEQ Director and for being too vague and not replicable.

A SIP must include enforceable emission limitations and control measures, coupled with methods for maintaining and analyzing data on air quality. 42 U.S.C. § 7410(a)(2). The EPA implemented this CAA provision with regulations under which:

> Each plan must set forth legally enforceable procedures that enable the State or local agency to determine whether the construction or modification of a facility, building, structure or installation, or combination of these will result in— (1) A violation of applicable portions of the control strategy; or (2) Interference with attainment or maintenance of a national standard in the State in which the proposed source (or modification) is located or in a neighboring State.

40 C.F.R. § 51.160(a).

Under the Texas Flexible Permit Program, the MRR requirements are written into each permit, rather than described in a one-size-fits-all manner in the SIP. *See* 30 Tex. Admin. Code §§ 116.711(2) (2010), 116.715(c)(6) (2010). These requirements are decided by the TCEQ on a case-by-case basis, based on the size, needs, and type of facility applying for flexible permitting. To be approved for a permit, the applicant must propose a workable plan for how emissions will be measured, and must detail the contaminants for which a cap is desired, the sources of emissions for those contaminants, emissions rate

No. 10-60614

calculations for each source, and proposed control technology.  *Id*. § 116.711 (2010).  "[T]he existing level of control may not be lessened for any facility." *Id*. § 116.711(3) (2010).

The EPA isolated two provisions within Texas's MRR framework as not complying with the requirements of the CAA:

> Measurement of emissions. The proposed facility, group of facilities, or account will have provisions for measuring the emission of air contaminants as determined by the executive director. This may include the installation of sampling ports on exhaust stacks and construction of sampling platforms in accordance with guidelines in the 'Texas Natural Resource Conservation Commission Sampling Procedures Manual.'

30 Tex. Admin. Code § 116.711(2) (2010).

> Recordkeeping.  A copy of the flexible permit along with information and data sufficient to demonstrate continuous compliance with the emission caps and individual emission limitations contained in the flexible permit shall be maintained in a file at the plant site and made available at the request of personnel from the commission or any air pollution control program having jurisdiction. . . . Additional recordkeeping requirements may be specified in special conditions attached to the flexible permit.

30 Tex. Admin. Code § 116.715(c)(6) (2010).

### 1.

The degree of discretion conferred on the TCEQ Director cannot sustain the EPA's rejection of the MRR requirements.  The EPA's task in reviewing a SIP revision is to determine whether the revision would interfere with attaining NAAQS or another applicable requirement of the CAA.  42 U.S.C. § 7410(*l*). Here, the relevant requirement of the CAA is the requirement that Texas define enforceable emission limitations and control measures, coupled with methods for maintaining and analyzing data on air quality.  *Id*. § 7410(a)(2).  The EPA insists that Texas's Program does not meet this requirement, but it is yet to

15

explain why. Instead, the EPA has invoked the term "director discretion" as if that term were an independent and authoritative standard, and has not linked the term to the language of the CAA. The EPA's use of a particular term does not constitute a "satisfactory explanation for its action" or a "consideration of the relevant factors" for its decision. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

There is, in fact, no independent and authoritative standard in the CAA or its implementing regulations requiring that a state director's discretion be cabined in the way that the EPA suggests. Therefore, the EPA's insistence on some undefined limit on a director's discretion is, like the Agency's insistence on a particular drafting style, based on a standard that the CAA does not empower the EPA to enforce. 5 U.S.C. § 706(2).

Any attempt to now link the EPA's disapproval to the CAA's language would be incoherent in the light of the Agency's other conduct. The EPA did not disapprove of the Flexible Permit Program's MRR requirements when commenting on Texas's proposed rulemaking in 1994 or disapprove of these provisions when Texas proposed other amendments in 1998, 2000, 2001, 2002, and 2003. In fact, the EPA approved nearly identical MRR requirements in other Texas Minor NSR provisions.[7] *See generally*, Approval and Promulgation of Air Quality Implementation Plans, 72 Fed. Reg. 49,198 (Aug. 28, 2007) (to be codified at 40 C.F.R pt. 52); Approval and Promulgation of Air Quality Implementation Plans, 68 Fed. Reg. 64,543 (Nov. 14, 2003) (to be codified at 40 C.F.R pt. 52).

The EPA contends that it now has a policy to disfavor director discretion provisions, but it did not cite this new policy in its proposed rule or final

---

[7] The EPA contends that this Court cannot consider the existence of identical provisions in other Texas Minor NSR permitting regulations, because Texas waived this issue during commenting. We find, however, that the EPA conceded that "the submitted Program requires the same monitoring, recordkeeping, reporting, and testing requirements as 30 TAC 116.711(2) and 116.715(c)(4)—(6)" during its proposed disapproval. 74 Fed. Reg. at 48,493.

No. 10-60614

disapproval of the Texas Flexible Permit Program, and we need not consider it here. We are reviewing an agency's decision-making process, so the "'agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *United States v. Garner*, 767 F.2d 104, 116-17 (5th Cir. 1985) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50). The EPA's post hoc reasoning during appellate review cannot prop up its decision. *See NorAm Gas Transmission Co.*, 148 F.3d at 1165.

Other recent EPA action tends not only to undercut the assertion of a policy against director discretion, but also to give the appearance that the EPA invented this policy for the sole purpose of disapproving Texas's proposal. Months before the EPA disapproved Texas's Flexible Permit Program, the EPA approved a Georgia SIP that not only recognized a state director's discretion, but permitted the director to exempt minor sources from MRR requirements entirely. Approval and Promulgation of Implementation Plans Georgia, 75 Fed. Reg. 6,309 (Feb. 9, 2010) (to be codified at 40 C.F.R. pt. 52). Although the EPA may certainly change its policies, it cannot reject the very concept of director discretion in one case months after approving extensive director discretion in another, and then hold out its rejection here as an example of reasoned decision-making.

2.

The EPA's objection to the MRR provisions as being too vague and not replicable cannot sustain its rejection of the MRR provisions, either. As with its discomfort with "director discretion," the EPA uses the term "replicability" as if it were an independent authoritative standard. It is not. Any standard by which the Texas Program is measured must derive from the CAA itself. 42 U.S.C. § 7410(*l*). As another panel of this Court recently held, "'replicability' is not a legal standard that the [CAA] authorizes the EPA to enforce when

reviewing a state's minor NSR program." *Luminant Generation Co., L.L.C. v. EPA,* 675 F.3d 917, 932 (5th Cir. 2012).

The administrative record does not contain an explanation linking the EPA's insistence on "replicability" to the standards provided in the CAA, and we cannot conclude under these circumstances that the EPA made a reasoned decision. The EPA cites to various Agency guidance documents extolling the virtues of clarity and replicability, generally, but it does not connect the persuasive force of these documents to the matter at hand. The EPA has simply failed to explain how Texas's case-by-case approach to permitting would interfere with NAAQS or another applicable requirement of the CAA. 42 U.S.C. § 7410(*l*).

The EPA, however, contends that it may insist on particular MRR requirements for the Texas Flexible Permit Program because the Program is unusually complex. In effect, the EPA proposes that it be given a sliding scale of legality—based on the EPA's general impression of a program's complexity—to then enable the EPA to condition program approval upon adoption of particular control measures and language. The EPA appears to have adopted this test, too, solely for application to Texas's Flexible Permit Program. We certainly agree that the EPA has the authority to ensure that a SIP is compliant with the CAA, but it cannot expand this congressionally delegated power based on ad-hoc and general assertions of a state program's complexity.[8]

---

[8] In its proposed disapproval of the Program, the EPA relied upon *New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005), for the proposition that "[t]he more intricate a plan, the greater the need for detailed requirements." 74 Fed. Reg. at 48,490. Deriving this standard from *New York* is error.

At issue in *New York* is the EPA's 2002 exemption of all recordkeeping requirements, unless a polluter anticipated that there is a "reasonable possibility" that new source review will be triggered. *New York*, 413 F.3d at 33. Under the disputed regulation in *New York*, a polluter would have to retain neither supporting data nor records of actual emissions if it anticipated that new source review most likely would not be triggered. *Id*. at 34. The D.C. Circuit determined that the EPA's regulation would be unenforceable because a polluter could

No. 10-60614

Even if we were to approve the general sliding scale that the EPA suggests, the characterization of the Flexible Permit Program as vastly more complex than any other permitting scheme is overstated. The EPA found that a "Texas Flexible Permit may apply to hundreds of dissimilar units. These covered emissions units can vary in size and type of operations as well as having widely different regulatory requirements and different applicable testing requirements." 74 Fed. Reg. at 48,490. Although this comment broadly states complexity, the exact same observation can be made about Minor NSR programs in Texas's SIP, which are currently approved by the EPA. The novel aspect of the Program now under review is not the breadth or variety of the sources encompassed by the permit, but instead it is the imposition of an emissions cap. *See* 30 Tex. Admin. Code § 116.716(a).

3.

In addition to its concern that the MRR requirements confer too much discretion on the TCEQ Director and are not replicable, the EPA posits that the MRR requirements for the Flexible Permit Program are unlike the MRR requirements in the federal Plant-wide Applicability Limits (PAL) program. The EPA's comparison to PAL is the only meaningful guidance the EPA has given to the TCEQ on the sort of MRR provisions that it could adopt to satisfy the EPA's objections.

The EPA's position on this point, like its insistence on a drafting style, significantly undermines the cooperative federalism that the CAA envisions. The CAA "supplies the goals and basic requirements of state implementation plans, but the states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Grp.*, 355 F.3d at 822 (citing *Union Elec. Co.*, 427

avoid new source review by destroying data and asserting that it was not required to keep records in the first place. *Id.*

19

No. 10-60614

U.S. at 266). Accordingly, the EPA ensures that a state's SIP is adequately compliant with the CAA, but has no authority to condition approval of a SIP based simply on the preference of the EPA for a particular control measure. *See Virginia*, 108 F.3d at 1406. When the EPA rejects a provision on the premise of enforceability, we must inquire whether the EPA's determination constitutes an impermissible control-specific means or a permissible end goal. *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000).

The EPA contends that it is merely encouraging Texas to adopt a program enforceable under the CAA, but after reading the EPA's final rule we find that this argument is not well-taken. In both its brief and final rule, the EPA relies upon a comparison to the PAL program—a federal Major NSR program—to illustrate what is lacking in this program—which Texas insists is a Minor NSR program. 75 Fed. Reg. at 41,317. Although the EPA now maintains that it is not stipulating that Texas must adopt the same MRR requirements as PAL, the purpose of the EPA's analogy is clear: Texas is to enact something like PAL if it wants its Flexible Permit Program approved. We find that the EPA's action amounts to an insistence on a particular control measure and is inconsistent with the principles of cooperative federalism that are an essential part of the CAA.

C.

We now turn to the third ground for the EPA's disapproval of the Flexible Permit Program: The methodology for calculating each emissions cap is not sufficiently clear and replicable, making it difficult to hold permit holders accountable for complying with their emissions caps. The arguments on this ground largely duplicate the arguments concerning the Program's MRR provisions, the only difference being that the focus here is on calculating the emissions cap, rather than record-keeping.

No. 10-60614

The EPA asserts that the program lacks objective and replicable methodologies for establishing emissions caps. 75 Fed. Reg. at 41,313. It states that the process for the caps' summation is unclear. 75 Fed. Reg. at 41,322. Specifically, the EPA argues that the Program is vague and that TCEQ failed to clarify whether the cap calculation includes not only minor stationary sources and minor modifications but also the major sources and major modifications. 75 Fed. Reg. at 41,322.

To determine a facility's cap under the Flexible Permit Program, the permit applicant must identify each air contaminant and each source it expects to be covered by the proposed permit. 30 Tex. Admin. Code § 116.711(13) (2010). Then, the TCEQ calculates emissions limits for each source and each contaminant by applying Best Available Control Technology (BACT).[9] *Id.* § 116.716(a) (2010). The sum of the emission limits for each of the covered sources comprises the permit's cap on pollution for that contaminant. *Id.* Thus, a facility remains in compliance so long as the aggregate sum of its emissions for a particular contaminant is less than the total output of all of the sources under the permit. Each permit, or at least documents attached to the permit, must explicitly outline the sources, contaminants, and corresponding caps that it covers. *Id.* § 116.715 (2010).

Premising disapproval on the ground that the Flexible Permit Program lacks clarity and replicability in the method for calculating emissions caps fails

---

[9] The Texas Administrative Code defines Best Available Control Technology as:
> An air pollution control method for a new or modified facility that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and economically reasonable for the facility. The emissions reduction can be achieved through technology such as the use of add-on control equipment or by enforceable changes in production processes, systems, methods, or work practice.

30 Tex. Admin. Code § 116.10(1).

for the same reason that premising disapproval on inadequate MRR provisions fails. The CAA does not make the replicability the EPA desires a standard for disapproving a SIP revision, and the EPA has not explained how the method for calculating emissions caps otherwise relates to a CAA standard. *See Luminant Generation*, 675 F.3d at 932.

Even if the EPA's "clarity and replicability" requirement were enforceable against Texas, we are not persuaded that this Program fails to satisfy those criteria. A third party could take the sources listed in the permit application, determine maximum outputs using BACT, and determine the cap. "Replicability," in the EPA's own words, means a methodology whereby two independent entities would reach the same result, not that a regulation must mandate perfectly uniform input of information to achieve that result. *See* 57 Fed. Reg. 13,498, 13,568 (Apr. 16, 1992).

To the extent that the EPA's argument draws on its belief that it is impossible to determine which sources are covered by a flexible permit, 75 Fed. Reg. at 41,322, that belief is unfounded. Texas requires each flexible permit to delineate which sources, contaminants, and facilities the permit covers. 30 Tex. Admin. Code § 116.715 (2010). During the application process, the applicant may select which facilities and sources to include on a permit. The cap is then calculated based on the facilities and sources selected. After the application is approved and the permit is issued, the sources and facilities covered by the permit—and the applicable cap—are listed on the permit itself. *Id.*

The EPA argues that because the Flexible Permit Program is cryptic in its treatment of major source modification, 75 Fed. Reg. at 41,322, it is unclear how major sources are treated under the cap in all circumstances. This argument is untenable for the same reasons we have discussed above in examining the EPA's first ground for disapproving the Flexible Permit Program—that is, the EPA's concern that major sources would avoid Major NSR by exploiting the Flexible

No. 10-60614

Permit Program. The Program's language requires major sources to comply with Major NSR. Major sources cannot use a flexible permit to avoid Major NSR without violating the law.

We thus find that the EPA's objections to the emissions caps of the Flexible Permit Program rely on standards not found in the CAA or its implementing regulations. The EPA's explanation for its objection is unsatisfactory because it provides no insight into how the emissions caps interfere with NAAQS or another applicable requirement of the CAA. 42 U.S.C. § 7410(*l*). The EPA acted arbitrarily and capriciously, and in excess of its statutory authority. 5 U.S.C. § 706(2).

## IV.

It is clear that Congress had a specific vision when enacting the Clean Air Act: The Federal and State governments were to work together, with assigned statutory duties and responsibilities, to achieve better air quality. The EPA's final rule disapproving Texas's Flexible Permit Program transgresses the CAA's delineated boundaries of this cooperative relationship. For the reasons we have explained above, we hold that the EPA's ruling does not withstand Administrative Procedure Act review. We therefore GRANT the petition for review, VACATE the agency's final rule, and REMAND for the EPA's further consideration.

PETITION FOR REVIEW GRANTED, FINAL RULE VACATED, and CASE REMANDED.

Higginbotham, Circuit Judge, dissenting:

This case centers on two questions. First, whether the EPA may require that Texas's Flexible Permit Program be limited to Minor NSR by language sufficiently clear to close paths around Major NSR requirements. And whether the EPA's conclusion that the Flexible Permit Program lacked that clarity was arbitrary or capricious. The majority does not dispute that the EPA could legitimately deny approval to Texas's Flexible Permit Program if the program were not clearly drafted to limit its applicability to Minor NSR but disagrees with the EPA's conclusion that the Flexible Permit Program lacks that clarity. Heeding the principle that the APA standard of "arbitrary and capricious" does not permit a court to vacate an agency decision based on its mere disagreement, I am persuaded that the EPA's conclusion that the submitted Program is not clearly limited to Minor NSR, allowing for circumvention of Major NSR requirements, was neither arbitrary nor capricious. Rather, I see my brothers in error in assigning marks for "federal" writing, low by their own unstated measure, and not faithfully applying the deferential arbitrary and capricious standard.

## I.

Under § 110(a) of the Clean Air Act, a State must adopt and submit to the EPA a plan for implementing the national ambient air quality standards ("NAAQS"), known as a state implementation plan or "SIP."[1] Each state implementation plan submitted by a State under the Clean Air Act must, among other requirements, "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable requirements of [the Clean Air Act]."[2] The EPA "shall not approve

---

[1] 42 U.S.C. § 7410(a).

[2] *Id.* § 7410(a)(2)(A).

a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in [42 U.S.C. § 7501]), or any other applicable requirement of [the Clean Air Act]."[3]  The agency must approve the plan "as a whole if it meets all of the applicable requirements of [the Clean Air Act]" and a "plan revision shall not be treated as meeting the requirements of [the Clean Air Act] until the Administrator approves the entire plan revision as complying with the applicable requirements of [the Clean Air Act]."[4]  The EPA's own regulations provide that state implementation plans and their revisions must "be adopted as rules and regulations enforceable by the State agency."[5]

The EPA's task in evaluating a state implementation plan or a revision to a state implementation plan purportedly limited to Minor NSR is thus to assess the text of the "rules and regulations" adopted by the State and to determine whether those rules and regulations, by their own terms, serve the goals and satisfy the basic requirements set out in the Clean Air Act.[6]  The majority does not directly dispute this point.  Nor does it take issue with the EPA's conclusion that the Clean Air Act requires EPA "review [to be] focused on the structure of the submitted Program."[7]

---

[3] *Id.* § 7410(*l*).

[4] *Id.* § 7410(k)(3).

[5] 40 C.F.R. § 51.281.

[6] *Id.*

[7] Approval and Promulgation of Implementation Plans; Texas; Revisions to the New Source Review (NSR) State Implementation Plan (SIP); Flexible Permits, 75 Fed. Reg. 41,312, 41,322 (July 15, 2010) (to be codified at 40 C.F.R. pt. 52); *see also id.* at 41,325 ("Submitted rules that are clear as to who must comply, and explicit in their applicability to regulated sources are appropriate means for achieving the statutory enforcement requirement.").

"[T]he EPA's authority under the [Clean Air Act] is limited to determining whether the proposed SIP revision . . ., *as written*, complies with the Act."[8] In explaining its conclusion that, as crafted, the Flexible Permit Program creates the potential for circumvention of Major NSR, the EPA cited several aspects of the submitted program. It found that the absence of any express provision clearly limiting the program's use to Minor NSR or clearly prohibiting the program's use to circumvent Major NSR requirements potentially exempted new major stationary sources and major modifications from the EPA's Major NSR SIP requirements. It also noted that holders of Major NSR SIP permits are not prohibited from using the Program's allowables-based emissions cap. The EPA explained that it reviewed the regulations as submitted to determine whether the Flexible Permit Program, as structured, is enforceable pursuant to § 110(a)(2)(A)-(C) of the Clean Air Act. The Program establishes a cap in a Flexible Permit that is a summation of the BACT emission rates, but "[t]he submitted rules are not clear as to how the State does the summation."[9] As the EPA noted, "[e]ven the State fail[ed] in its comment letter to clarify whether the cap includes the summation of not only the minor stationary sources and minor modifications but also the major stationary sources' and major modifications' emissions limitations."[10] That "failure to clarify the methodology for the establishment of the cap contributes to the ambiguity" of the regulations.[11]

In addition, the EPA found that Texas's definition of "account" allows an account that is covered by a Flexible Permit to include any combination of major

---

[8] *Luminant Generation Co. LLC v. U.S. Envtl. Prot. Agency*, --- F.3d ---, 2012 WL 3065315, at \*14 (5th Cir. 2012) (emphasis added).

[9] *Id.* at 41,322.

[10] *Id.*

[11] *Id.*

and minor sources under common ownership or control and located in one or more contiguous properties.[12]  This is contrary to Major NSR requirements, which only allow emissions increases to be offset by emissions decreases from a stationary source within the same industrial grouping.  In response, the State asks the court to defer to "Texas's reasonable interpretation" of the term "account" as not allowing for circumvention of Major NSR; notes that the EPA recognizes that Texas's Major NSR rules limit emissions trading between stationary sources; and suggests that "the provisions of the . . . Program are . . . more than sufficient to enforce against any person who would intentionally or by wrongful presumption use the Program to circumvent major NSR."  The State's response does not engage the EPA's argument, which turns on how *the terms of the Flexible Permit Program* fail "to make clear that sources may not use the broad definition of 'account' to avoid Major NSR," not on whether other TCEQ regulations provide for enforcement against people who would do so.  Both the State and Industry Petitioners fail to counter the EPA's analysis of how the definition of "account" within the Flexible Permit Program interferes with federal Major NSR regulations.

The State and Industry Petitioners have not demonstrated that the EPA's conclusion that the submitted program opens a door to circumvention of Major NSR requirements was arbitrary or capricious.  The State argues that at 30 Tex. Admin. Code §116.711(8)-(9), the Program rules specify that a proffered change triggering Major NSR must comply with Texas's Major NSR requirements.  Yet those paragraphs are part of the rules regarding the "Flexible Permit Application" – not the rules for "Applicability" – and they merely state,

---

[12] *See id.* at 41,327–28.

> In order to be granted a flexible permit or flexible permit amendment, the owner or operator of the proposed facility shall submit information to [TCEQ] which demonstrates that all of the following are met:
>
> . . .
>
> (8) Nonattainment review.  If the proposed facility, group of facilities, or account is located in a nonattainment area, each facility shall comply with all applicable requirements concerning nonattainment review in this chapter.
>
> (9) Prevention of Significant Deterioration (PSD) review.  If the proposed facility, group of facilities, or account is located in an attainment area, each facility shall comply with all applicable requirements in this chapter concerning PSD review.

Contrary to the State's assertion, the EPA did not ignore that language in the regulations.[13]  The EPA found that the language cited by the State is insufficient to establish that the Program applies only to Minor NSR because (1) the cited paragraphs only generally require compliance with all applicable requirements for non-attainment and PSD review within the Chapter rules;[14] (2) the cited paragraphs "do not contain any emission limitations, applicability statement, or regulatory provision restricting the construction or change to Minor NSR or clearly prohibiting circumvention of Major NSR";[15] (3) there are no requirements or terms in the regulations that "expressly identify use of Flexible Permits as only a Minor NSR option";[16] and (4) the regulations for Texas's two other Minor

---

[13] *See, e.g.*, *id.* at 41,319.

[14] *Id.*

[15] *Id.*

[16] *Id.*

NSR SIP alternative permit options *do* expressly limit applicability to Minor NSR.[17]

While, in the State's words, EPA "did not complain about" the language of paragraphs (8) and (9) when used in regulations for other Texas Minor NSR programs, those other regulations contained express language limiting applicability of the programs to Minor NSR and precluding owners or operators from circumventing the Major NSR applicability determinations required by 30 Tex. Admin. Code § 116.110. Indeed, as the EPA noted in its final rule, the fact that Texas explicitly requires a Major NSR applicability determination in analogous programs elsewhere within the same regulatory scheme reinforces the porous ambiguity of the challenged regulations.

Nor does the EPA's final rule demand that Texas write its SIP regulations with a particular sentence structure or style. Rather, the EPA concluded that the submitted program, as written, is not clearly limited to Minor NSR. The EPA's references to federal and state programs that pass muster illustrate the agency's reasoning and provide examples that might guide the State, but a fair reading does not support the contention that those examples represent a demand that the State adopt verbatim the provisions of another state or federal program.

Finally, the State's contention that the EPA has improperly disregarded Texas's interpretation of its own rules and regulations is without merit. The EPA recognized that Texas intended the Flexible Permit Program to function as Minor NSR when the EPA disapproved the Program; Texas's current understanding of the Program as applying only to Minor NSR does not establish

---

[17] *See id.*; *cf. Luminant Generation Co. LLC v. U.S. Envtl. Prot. Agency*, --- F.3d ---, 2012 WL 3065315, at *14 (5th Cir. 2012) (noting that the "plain text" of another proposed Texas SIP revision "supports the EPA's reasoning that the provision, when applied, *may not* require a source owner or operator to establish all elements of [an] affirmative defense" for planned startup, shutdown, and maintenance/malfunction activity (emphasis added)).

that the language in the regulations is unambiguous. Indeed, during the comment period, TCEQ acknowledged that the submitted Program's rules were not clear as to whether the Program could function as a Major NSR SIP revision.[18] Underlining this lack of clarity, the Electric Reliability Coordinating Council (ERCC) – an industry group – presumed in its comments to the EPA that the Program applied to major modifications.[19]

I am confessedly uncertain as to the majority's questioning of the EPA's authority. To determine whether a SIP revision meets "all the applicable requirements" of the Clean Air Act,[20] the EPA must first determine whether or not the submitted program is limited to minor stationary sources and modifications.[21] The submitted SIP revision either does or does not clearly prohibit the circumvention of Major NSR. Agreeing with the State's assessment of the Program, the majority suggests that this decision resides with Texas and not with the EPA. But, subject to the limitation of arbitrary and capricious review, the rejection of SIP revisions is well within the statutory power of the EPA. In finding that the Flexible Permit Program is "ambiguous regarding circumvention of Major NSR,"[22] the EPA has not "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter

---

[18] *Id.* at 41,319.

[19] *Id.* at 41,319–20; *see id.* at 41,320 ("The commenter's comments are . . . at odds with TCEQ's comments. TCEQ comments that its Program is intended to be a Minor NSR program only. In contrast, the commenter describes the submitted Program as covering major modifications and having a Flexible Permit (not a Major NSR SIP permit) altered to reflect the Major NSR review.").

[20] 42 U.S.C. § 7410(k)(3).

[21] *Compare id.* § 7410(a)(2), *with id.* § 7502(c).

[22] 75 Fed. Reg. at 41,318.

10-60614

to the evidence," or reached a conclusion "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[23] And I find no error in the EPA's analysis.

## II.

The majority excoriates the EPA for taking sixteen years to disapprove the Flexible Permit Program. Such delay is plainly excessive and ill serves the public interest vested in orderly cooperative regulation. But in this failure of timely process the State was no innocent. Congress established a specific remedy for an EPA failure to take action on a SIP revision by the statutory deadline: a State or other party with standing may bring a mandatory duty suit in federal district court under 42 U.S.C. § 7604(a)(2). The State never filed such an action, and Industry Petitioners did not avail themselves of this remedy until 2008.[24] Regardless, EPA lethargy does not bear on the reasonableness of the EPA's findings.

As the State's focus on the EPA's undue delay hints, its challenge to the EPA's final rule might be better understood as an expression of principled indignation than as an attempt to defend and preserve the aspects of the Flexible Permit Program that the EPA disapproved. Indeed, at oral argument, counsel for the State struggled to articulate what was really at stake in this case. As TCEQ noted in its comments on the proposed rule, it has now revised the regulations at issue to clarify the Program's limitation to Minor NSR, and it has stated that it will address the EPA's concerns about the lack of MRR requirements in a forthcoming rulemaking and SIP revision. It seems everyone agrees that the Flexible Permit Program should not be used to circumvent the

---

[23] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[24] *See BCCA Appeal Group v. EPA*, No. 3:08-cv-01491-G (N.D. Tex. filed Aug. 25, 2008).

31

requirements of Major NSR. The practical effect of EPA's decision is that the State must submit revised regulations – for the most part already drafted and adopted by TCEQ – for EPA approval. The State understandably bristles at having to travel through the administrative bureaucracy once again, but indignation is not a ground on which we may vacate the EPA's final action.

**III.**

The Clean Air Act does not state explicitly that a state implementation plan that is not clearly drafted to limit its application to Minor NSR must fulfill the requirements for Major NSR plans.[25] However, the EPA reasonably concluded that such a limitation is implicit in the statutory provisions regarding EPA review and approval of SIP revisions submitted by the states,[26] and contrary to the majority's suggestion, the EPA's determination that the Flexible Permit Program is not clearly limited to Minor NSR, allowing for circumvention of Major NSR requirements, was not arbitrary or capricious given the structure and language of the submitted regulations. Nor did the EPA act in excess of its statutory authority.

As so often with political debate in search of a legal forum, its utility lies largely in pleasure of expression. Angst over perceived federal intrusion into state affairs ought be eased by the reality that laws enacted by Congress are laws of the States. Congress passed the Clean Air Act and made it enforceable by the EPA. The State was represented in that decision by two senators and its

---

[25] *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (explaining that where a statute is "silent," courts must defer to the reasonable interpretation of the agency that administers the statute).

[26] *See* 42 U.S.C. §§ 7410(a), (k)(3),(*l*); *Chevron*, 467 U.S. at 843; 75 Fed. Reg. at 41,319–21.

10-60614

thirty-two other elected members of Congress.  It also bears mentioning that its former governor was resident in the White House for eight of the years in passage here.  The Clean Air Act is not foreign law.[27]  I dissent.

---

[27] *See Testa v. Katt*, 330 U.S. 386, 391 (1947) (noting the Supreme Court's repudiation of "the assumption that federal laws can be considered by the states as though they were laws emanating from a foreign sovereign").